**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DARRELL ANTHONY GAUTT,
            *Petitioner-Appellant,*

v.

GAIL LEWIS, Warden,
            *Respondent-Appellee.*

No. 03-55534

D.C. No.
CV-01-06771-PA

OPINION

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted
January 26, 2007—San Francisco, California

Filed June 6, 2007

Before: M. Margaret McKeown and Marsha S. Berzon,
Circuit Judges, and Samuel P. King,* Senior District Judge.

Opinion by Judge Berzon

*The Honorable Samuel P. King, Senior United States District Judge
for the District of Hawaii, sitting by designation.

**COUNSEL**

Wayne Young, Santa Monica, California, for the petitioner-appellant.

Ryan B. McCarroll and Steven E. Mercer, Deputy Attorney Generals, Los Angeles, California, for the respondent-appellee.

---

## OPINION

BERZON, Circuit Judge:

We consider whether Darrell Anthony Gautt's constitutional due process right to be informed of the charges against him was violated when he was charged with a sentencing enhancement under one statute, section 12022.53(b) of the California Penal Code,[1] but had his sentence enhanced under a second, different statute, section 12022.53(d). The first statute, not the second, was alleged by number and by nearly verbatim description in the information. We hold that Gautt's due process right was indeed violated when, as a result of this discrepancy, he was sentenced pursuant to a twenty-five-year-to-life enhancement, rather than a ten-year enhancement, and that the California appellate court's decision to the contrary constituted "an unreasonable application of [ ] clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). We therefore reverse the district court's denial of Gautt's petition for a writ of habeas corpus. On remand, the district court shall grant a conditional writ of habeas corpus, ordering that the state release Gautt unless it re-sentences him.[2]

---

[1] All citations are to the 1998 version of the California Penal Code, unless otherwise stated.

[2] Gautt also challenges his second-degree murder conviction under section 187(a) of the California Penal Code, arguing that his equal protection rights were violated when the prosecution exercised its peremptory strikes in a racially discriminatory manner. *See Johnson v. California*, 545 U.S. 162 (2005); *Batson v. Kentucky*, 476 U.S. 79 (1986). We reject this challenge and affirm the denial of Gautt's habeas petition as to the underlying conviction in a separate unpublished memorandum disposition filed simultaneously with this opinion.

**I**

The barebones facts of Gautt's crime are that on January 10, 1998, Gautt shot and killed Samantha Fields, after demanding that she pay him $25 for cocaine he had given her the day before. Just prior to the shooting, Gautt had used cocaine. Gautt threatened Fields by holding the gun close to her. The gun went off, but none of the several people in the room saw the shooting. Gautt later maintained that the gun fired only because Fields reached up and knocked either his hand or the gun. Fields died from a single gunshot wound to her chest. Afterwards, Gautt threatened the other people in the room with the gun and made them help him dispose of the body. Further details of the crime do not matter for purposes of the current appeal.

The facts that do matter here are procedural and concern the content of Gautt's information, the trial court's instructions to the jury, the closing arguments, the verdict form, and the ultimate judgment, as well as the substance of the two statutory provisions at the center of this case — sections 12022.53(b) and 12022.53(d).

(1)   The information charged Gautt with one count of murder and one count of possession of a firearm by a felon under sections 187(a) and 12021(a)(1), respectively. It also charged him with violating sections 1203.06(a)(1), 12022.5(a)(1), and 12022.53(b), each of which imposes additional penalties on defendants convicted of "personally us[ing] a firearm" in the commission of a crime. As stated in the information, a conviction under section 12022.53(b) translates into a ten-year sentence enhancement.[3] The information

---

[3]Section 1203.06(a)(1)(A) provides a different penalty than is provided for by section 12022.53(b). Under section 1203.06(a)(1)(A), "[p]robation shall not be granted to, nor shall the execution or imposition of sentence be suspended for . . . [a]ny person who personally used a firearm during the commission or attempted commission of . . . [m]urder." CAL. PENAL CODE § 1203.06.

made no reference to section 12022.53(d). This omission is the pivotal fact in this case.

Sections 12022.53(b) and 12022.53(d) differ in several critical respects. In full, section 12022.53(b) states:

> Notwithstanding any other provision of law, any person who is convicted of a felony specified in subdivision (a),[4] and who in the commission of that felony *personally used a firearm*, shall be punished by a term of imprisonment of 10 years in the state prison, which shall be imposed in addition and consecutive to the punishment prescribed for that felony. The firearm need not be operable or loaded for this enhancement to apply.

CAL. PENAL CODE § 12022.53(b) (emphasis added).

In contrast, section 12022.53(d) provides:

> Notwithstanding any other provision of law, any person who is convicted of a felony specified in subdivision (a) . . . and who in the commission of that felony *intentionally and personally discharged a*

---

Under section 12022.5(a)(1), a ten-year-sentence enhancement like that automatically provided for under section 12022.53(b) is one possible penalty within a range. Specifically, section 12022.5(a)(1) provides:

> any person who personally uses a firearm in the commission or attempted commission of a felony shall, upon conviction of that felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of imprisonment in the state prison for 3, 4, or 10 years.

*Id.* § 12022.5(a)(1).

[4]For purposes of both section 12022.53(b) and 12022.53(d), the felonies enumerated in section 12022.53(a) include murder under section 187.

*firearm and proximately caused great bodily injury*
. . . to any person other than an accomplice, shall be
punished by a term of imprisonment of 25 years to
life in the state prison, which shall be imposed in
addition and consecutive to the punishment pre-
scribed for that felony.

*Id.* § 12022.53(d) (emphasis added).

Crucially, while conviction under section 12022.53(b)
requires only that the defendant "personally *used* a firearm,"
conviction under section 12022.53(d) requires considerably
more — namely, that the defendant "personally *discharged* a
firearm," that he did so "intentionally," and that he "proxi-
mately caused great bodily injury." Commensurate with its
less serious nature, conviction under section 12022.53(b)
leads to a ten-year sentence enhancement; in contrast, a con-
viction under section 12022.53(d) generates a far heavier,
twenty-five-year-to-life, enhancement.

(2) Despite these major differences, the trial court confused
the two statutes when time came to instruct the jury. While
ostensibly reciting the elements for section 12022.53(b), the
trial judge actually recited those additional elements unique to
section 12022.53(d): personal discharge, intentional dis-
charge, and proximate causation of great bodily injury —
here, death:[5]

---

[5]Neither party objected to this instruction.

The transcript from the instructions conference suggests that there
would have been no opportunity before the actual recital of the instruction
to the jury to do so. Neither the prosecutor nor Gautt's lawyer ever
reviewed the actual substance of the instruction with the judge. Instead, it
appears that both parties simply assumed that the court would give a cor-
rect instruction for section 12022.53(b). The trial court never stated other-
wise before actually giving the instruction.

For example, at one point during the colloquy, the prosecutor referred
to an instruction for "12202.53, personal use." At another point, both the

It is alleged in Count One that in the commission or attempted commission of the crime charged therein described, the defendant Darrell Gautt *personally discharged* a firearm, causing the death of Samantha Fields, *within the meaning of Penal Code section 12022.53, subdivision b*.

If you find the defendant guilty of the crime of murder, you must determine whether the defendant *personally discharged* a firearm in the commission or attempted commission of the crime of murder, and whether it *proximately caused* the death of Samantha Fields.

The word firearm as used in this instruction includes a handgun. The term personally *discharged a firearm*, as used in this instruction, means that the defendant must have personally and *intentionally* fired it.

(Emphases added.)

(3)    Despite these instructions, the prosecution during its subsequent closing argument specifically disavowed any need to show that Gautt had intentionally *discharged* the weapon, the requirement unique to section 12022.53(d). Instead, the

---

trial judge and prosecutor referred to California Jury Instruction 17.19, which is applicable to, among other statutory provisions, sections 1203.06(a)(1), 12022.5(a), and 12022.53(b) of the California Penal Code. *See* CAL. JURY INSTR. CRIM. 17.19. Indeed, the prosecutor initially requested that the trial judge instruct the jury that for the sentence enhancement to apply, the "firearm need not be operable," a request that makes sense only if she was assuming the instruction was to apply to an enhancement under section 12022.53(b), rather than section 12022.53(d). Finally, when the trial judge summarized the instructions toward the end of the conference, she simply stated, "then we have 12022.53 and the 12022.5 A and 17.19," without clarifying which portion of section 12022.53 she was referring to.

prosecutor focused solely on Gautt's *use* of the handgun, the only showing required under section 12022.53(b). As she told the jury:

> He pulled the trigger. I submit to you at that moment he meant to. *But that's not at issue in this case because I'm not asking you to find he intended to do it.*
>
> What I'm asking you and hope actually showing you, looking at the law and applying the facts in this case, that killing in this case resulted from the intentional act of *pointing a loaded handgun* at Samantha Fields with his finger on the trigger. . . .

(Emphases added.) Similarly, when the prosecutor later recited the elements of the "personal discharge" enhancement, she did *not* mention intent to discharge the firearm; instead, she indicated that it was sufficient that "[h]e had his finger on the trigger when the murder took place."

(4)    The pattern of statutory confusion and conflation that began with the trial judge's instructions to the jury repeated itself when the jury completed its verdict form. The verdict form asked jurors, if they found Gautt guilty of one count of second-degree murder, under section 187(a), and one count of possession of a firearm by a felon, under section 12021(a)(1), to decide whether Gautt was also guilty under sections 1203.06(a)(1) and 12022.5(a)(1), for "personally us[ing] a firearm, to wit: handgun" during "the commission and attempted commission" of Fields's murder. Until this point then, the verdict form perfectly corresponded to the charges presented in the information. The jury's finding that Gautt was guilty under sections 1203.06(a)(1) and 12022.5(a)(1) therefore presents no due process problems.

The verdict form and the information deviated, however, with regard to section 12022.53(b). According to the verdict form, the jury was to decide whether Gautt

> *personally discharged* a firearm in the commission of the crime of MURDER that *porximately* [sic] *caused* the death of Samantha Fields, within the meaning of Penal Code Sections 12022.5(a)(1) and *12022.53(b)*.

(Emphases added.) In other words, the verdict form cited to section 12022.53(b), but listed the personal discharge and proximate causation elements unique to section 12022.53(d). Complicating matters even further, the verdict form did not include section 12022.53(d)'s element of intentional discharge.[6] The jury, using the verdict form, found Gautt guilty of violating section 12022.53(b), the ten-year enhancement, but applied some of the elements of section 12022.53(d)'s twenty-five-year-to-life enhancement.[7]

(5) The abstract of judgment contains yet one more discrepancy. Although that document listed section 12022.53(b), the ten-year enhancement, as the basis for a sentence enhancement, it also stated that Gautt's sentence was to be enhanced twenty-five years to life — the applicable enhancement under section 12022.53(d).

---

[6]For reasons that are unclear, this paragraph of the verdict form also referenced section 12022.5(a)(1), even though the paragraph immediately preceding it already presented jurors with the question whether Gautt was guilty under section 12022.5(a)(1). Moreover, the preceding paragraph — unlike this one — accurately described the relevant element of section 12022.5(a)(1), defining it in terms of a "personal use," rather than a "personal discharge" offense. No one seems to have noticed that the verdict form listed the same statutory provision twice, but provided two different definitions of the offense.

[7]The verdict form employed the language "*within the meaning of . . .* section 12022.53(b)," and the jury had been instructed that "[t]he term personally discharged a firearm, as used in this instruction, means that the defendant must have personally and intentionally fired it." So one could understand the verdict form as including an intent element by incorporation, even though it did not expressly state any such requirement. As we have noted, however, the prosecutor apparently did not so understand the instruction. She argued the enhancement to the jury from the verdict form on the premise that no finding of intent to pull the trigger was necessary.

Gautt was sentenced to a term of imprisonment of forty-nine years and eight months to life, based in part on the twenty-five-year-to-life enhancement.[8] He appealed to the California Court of Appeal, which affirmed his conviction and sentence in an unpublished opinion but ordered the abstract of judgment "amended" to refer to section 12022.53(d), not section 12022.53(b), as the basis for the twenty-five-years-to-life enhancement. Gautt's petition for review to the California Supreme Court was denied, as was his petition for a writ of habeas corpus in the district court.[9]

## II

We review a district court's denial of habeas relief de novo. *See Plumlee v. Del Papa*, 465 F.3d 910, 917 (9th Cir. 2005). Because Gautt's habeas petition was filed after April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") dictates our analysis. *See Arredondo v. Ortiz*, 365 F.3d 778, 781 (9th Cir. 2004). Under AEDPA, a petition for a writ of habeas corpus cannot be granted as to an issue that the state court decided on the merits, unless

the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law,

---

[8]The sentence was calculated as follows: fifteen years to life for the second-degree murder conviction; the twenty-five-years-to-life sentence enhancement under section 12022.53; eight months for the possession of a firearm by a felon conviction; and an additional nine-year enhancement, pursuant to section 667.5(b) of the California Penal Code, because Gautt had served nine prior prison terms.

[9]The district court granted Gautt a certificate of appealability on the issue whether Gautt "was deprived of Due Process because the Second Amended Information, the jury instructions and the verdict were all based on § 12022.53(b), which carried a sentence of an additional ten years, while he was sentenced to an additional twenty-five years to life under § 12022.53(d)." We granted Gautt's later request to broaden his certificate of appealability to include his *Batson* claim. *See* note 2 *supra*.

as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). For purposes of this statute, "clearly established Federal law" refers to "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

A state court decision is "contrary to" such law if it (1) "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or (2) "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision is "an unreasonable application of" such law if "the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407. The petition must establish that the state court's application of governing law was not only erroneous, but also "objectively unreasonable." *See Andrade*, 538 U.S. at 75; *Williams*, 529 U.S. at 409-10.

When applying this standard, we review the "last reasoned decision" by a state court. *See Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). In this case, that judgment is the California Court of Appeal's.

## III

We begin our analysis by describing "clearly established Federal law" with respect to a criminal defendant's right to be

sufficiently informed of the charges against him. We then turn to the California Court of Appeal's opinion, reviewing that court's treatment of the relevant federal law and the facts presented by Gautt's case. Finally, we address the state's argument that other sources, beyond the information, provided Gautt with sufficient notice of a pending charge under section 12022.53(d).

## A

The Sixth Amendment guarantees a criminal defendant the fundamental right to be informed of the nature and cause of the charges made against him so as to permit adequate preparation of a defense. *See* U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation . . . ."); *Cole v. Arkansas*, 333 U.S. 196, 201 (1948) ("It is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made."); *In re Oliver*, 333 U.S. 257, 273 (1948) ("A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense — a right to his day in court — are basic in our system of jurisprudence. . . ."); *Jackson v. Virginia*, 443 U.S. 307, 314 (1979) ("[A] person cannot incur the loss of liberty for an offense without notice and a meaningful opportunity to defend."). This guarantee is applicable to the states through the due process clause of the Fourteenth Amendment. *See Cole*, 333 U.S. at 201 ("No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal.").[10] When determining

---

[10]In addition to raising a Sixth Amendment "right to notice" claim, Gautt also claims that the state trial court erred when it "constructively amended" the information by broadening the jury instructions so as to

whether a defendant has received fair notice of the charges against him, we begin by analyzing the content of the information. *See Cole*, 333 U.S. at 198; *see also James v. Borg*, 24 F.3d 20, 24 (9th Cir. 1994) (holding that to determine whether the defendant had adequate notice, "the court looks first to the information," the "principal purpose of [which] is to provide the defendant with a description of the charges against him in sufficient detail to enable him to prepare his defense") (citing *Lincoln v. Sunn*, 807 F.2d 805, 812 (9th Cir. 1987)); *cf. Stirone*, 361 U.S. at 217 (stating that under the Fifth Amendment's right to a grand jury indictment, "a court cannot permit a defendant to be tried on charges that are not made in the indictment against him").

In *Cole*, the Court carefully examined the information, concluding that defendants had not been sufficiently apprised of a charge under § 1 of an Arkansas statute, the provision that the state supreme court relied upon when affirming their convictions. 333 U.S. at 197-98, 200. Instead, as the Court explained, the defendants had "read the information as charging them with an offense under § 2 of the Act," in no small part, because while the information itself did not cite to either statute, the "language describing the offense charged in the information [was] substantially identical with the . . . language of § 2 of the Arkansas Act," which "describes an

---

allow the jury to convict him of an offense with which he was never charged. A constructive amendment constitutes a violation of one's Fifth Amendment right to presentment or indictment by a grand jury. *See* U.S. CONST. amend. V; *Stirone v. United States*, 361 U.S. 212, 215-18 (1960); *United States v. Aguilar*, 756 F.2d 1418, 1423 (9th Cir. 1985). As the state correctly points out, however, this Fifth Amendment right has not been incorporated into the Fourteenth Amendment so as to apply against the states. *See Branzburg v. Hayes*, 408 U.S. 665, 688 n.25 (1972) (citing *Hurtado v. California*, 110 U.S. 516, 534-35 (1884)); *see also Williams v. Haviland*, 467 F.3d 527, 531-32 (6th Cir. 2006) (holding that *Apprendi* did not change the "Supreme Court's repeated assertion that the Grand Jury Clause of the Fifth Amendment does not apply to the states"). Gautt's constructive amendment argument thus lacks merit.

offense separate and distinct from the offense described in"
§ 1. *Id.* at 198, 200. Thus, to satisfy the Sixth Amendment,
"an information [must] state the elements of an offense
charged with sufficient clarity to apprise a defendant of what
he must be prepared to defend against." *Givens v. House-
wright*, 786 F.2d 1378, 1380 (9th Cir. 1986) (citing *Russell v.
United States*, 369 U.S. 749, 763-64 (1962)). An explicit cita-
tion to the precise statute at issue is best, but a "brief factual
recitation in the information" can also suffice. *Id.* at 1381.

Besides the information, *Cole* also considered as part of its
due process analysis the content of jury instructions. *See* 333
U.S. at 199. The Court did not, however, treat those instruc-
tions as a means of providing defendants with notice of the
charges against them. Rather, the Court looked to the instruc-
tions only as evidence of the ultimate grounds for conviction.
In particular, *Cole* explained that because the trial judge
instructed the jury on the elements of § 2 "at the request of the
prosecuting attorney," "[w]ithout completely ignoring the
judge's charge, the jury could not have convicted petitioners
for having committed the separate, distinct, and substantially
different offense defined in § 1." *Id.* at 199-200. As a result,
by affirming defendants' convictions on the grounds that they
had violated § 1 — "when in truth they had been tried and
convicted only of a violation of a single offense charged in
§ 2" — the state supreme court, *Cole* held, had deprived
defendant of their due process rights. *Id.* at 202; *see also id.*
at 201 ("If, as the State Supreme Court held, petitioners were
charged with a violation of § 1, it is doubtful both that the
information fairly informed them of that charge and that they
sought to defend themselves against such a charge; it is cer-
tain that they were not tried for or found guilty of it." (relying
on *De Jonge v. Oregon*, 299 U.S. 353, 362 (1937)).

**[1]** *Cole* was, of course, a Supreme Court case, as was *De
Jonge* before it. We therefore conclude that, for purposes of
AEDPA's "clearly established Federal law" requirement, it is
"clearly established" that a criminal defendant has a right,

guaranteed by the Sixth Amendment and applied against the states through the Fourteenth Amendment, to be informed of any charges against him, and that a charging document, such as an information, is the means by which such notice is provided. To satisfy this constitutional guarantee, the charging document need not contain a citation to the specific statute at issue; the substance of the information, however, must in some appreciable way apprise the defendant of the charges against him so that he may prepare a defense accordingly.[11]

## B

Gautt presented his "right to notice" claim to the California Court of Appeal on direct appeal, arguing that the trial court erred in imposing the twenty-five-year-to-life sentence

---

[11]Because the Supreme Court has written relatively sparingly on a defendant's right to notice in the Sixth and Fourteenth Amendment contexts, our analysis is based on *Cole* and the case on which it relies for its due process notice, *De Jonge.* To be sure, other Supreme Court cases have recognized this constitutional right, but none have shed additional light on what sources may be used to determine whether a defendant has, in fact, been given adequate notice. *See Oliver*, 333 U.S. at 273-74 (holding that a state court judge cannot charge a witness with contempt, immediately convict him, and thereupon sentence him to jail, without implicating his constitutional right to reasonable notice of a charge against him); *Jackson*, 443 U.S. at 314 (recognizing that "a person cannot incur the loss of liberty for an offense without notice and a meaningful opportunity to defend," before proceeding to its more central holding that "[a] meaningful opportunity to defend . . . presumes . . . that a total want of evidence to support a charge will conclude the case in favor of the accused"); *In re Ruffalo*, 390 U.S. 544, 550 (1968) (holding that a lawyer involved in disbarment proceedings is, like a criminal defendant, entitled to "fair notice of the charge," but never explaining how such notice can be provided). The Tenth Circuit, presented with a similar substantive question in an AEDPA context — whether notice of charges was provided in a criminal proceeding — has relied on the same small set of Supreme Court cases for direction on what sources it may consider for evidence that the defendant received adequate notice. *See Hain v. Gibson*, 287 F.3d 1224, 1231 (10th Cir. 2002) (citing *Cole* and *Jackson* in addition to other related circuit court cases).

enhancement because section 12022.53(d) was never properly charged in the information. He separately argued that the jury never found this sentence enhancement and that, as a result, his rights under *Apprendi v. New Jersey*, were violated by the sentence enhancement. *See* 530 U.S. 466, 490 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.").[12] In an unpublished opinion, the state appellate court rejected these claims.

## 1

The California Court of Appeal began its analysis with general descriptions of the information, the jury instruction, the verdict form, the abstract of judgment, and the relevant statutes. *See People v. Gautt*, No. B136634, slip op. at 13-15 (Cal. Ct. App. May 7, 2001). It then proceeded — as it should have — to hone in on the information, explaining that "[r]eference to an incorrect penal statute in an information is of no consequence provided the pleading document adequately informs the defendants of the acts he is accused of committing." *Id.* at 15 (citing *People v. Thomas*, 43 Cal. 3d 818, 826 (1987)). The state appeals court added that "[a]s long as the acts themselves are sufficiently stated, the information is sufficient even if it refers to the wrong Penal Code section." *Id.* at 16 (citing *People v. Haskin*, 4 Cal. App. 4th 1434, 1439 (1992)).

Having so heavily emphasized the role of the charging document in providing the defendant with adequate notice, however, the California Court of Appeal never actually scrutinized the information to see if it contained any factual allegations that would have sufficiently informed Gautt of a

---

[12]Gautt renewed his *Apprendi* argument before us. Because we grant Gautt's habeas petition on "right to notice" grounds, we do not reach his *Apprendi* claim.

charge under section 12022.53(d). Instead, it summarily concluded that "[t]he question of whether Gautt intentionally shot Fields was fully presented to the jury by the trial evidence, the jury instructions and closing argument" — an analysis that seems to go only to Gautt's *Apprendi* claim. *Id*.

At no point in its opinion did the court explain how exactly this triumvirate — the evidence, the jury instructions, and the closing argument — provided Gautt with sufficient notice of a section 12022.53(d) charge,[13] nor did it discuss whether notice via these means could ever satisfy the Sixth Amendment requirements at issue. Still, the state appellate court clearly rejected Gautt's "right to notice" claim, as it ultimately affirmed both his conviction under section 12022.53(d) and the concomitant sentence. Finally, at the tail end of its decision, in a ruling akin to that of the state supreme court in *Cole* — which affirmed the defendants' convictions on grounds for which they were never charged, tried, or convicted, *see* 333 U.S. at 200-01 — the California Court of Appeal ordered the abstract of judgment "amended" to reflect the fact that Gautt's

---

[13]To be sure, the state appellate court did discuss some of the trial evidence regarding whether Gautt intentionally discharged the firearm. *Gautt*, slip. op. at 8-9. That discussion, however, was in the context of addressing a separate claim brought by Gautt — whether there was sufficient evidence to support a finding of intentional discharge — and not in the context of his Sixth Amendment right to notice claim. *Id.* Determining, through the benefit of hindsight, that enough evidence was presented to support an intentional discharge finding is not the same as determining that Gautt had adequate notice to defend against this charge during the course of his trial.

Similarly, although the state appellate court discussed the prosecutor's closing argument, it did so in the context of an entirely different claim raised by Gautt — namely, whether the prosecutor engaged in misconduct when she (1) explained the difference between felony murder and misdemeanor manslaughter to the jury during closing argument, despite the fact that Gautt was never charged with felony murder; and (2) exhorted the jury not to "give [Gautt] a break." *Id.* at 9-13. This discussion is inapposite to the question whether the closing argument provided Gautt with sufficient notice of a potential conviction under section 12022.53(d).

sentence was enhanced pursuant to section 12022.53(d), not section 12022.53(b). *See Gautt*, slip op. at 18. In doing so, the state appeals court did not acknowledge the multiple discrepancies that existed between the information, the jury instructions, the verdict form, and the ultimate sentence.

**[2]** As the foregoing analysis indicates, the California Court of Appeal did correctly recite federal law, by explaining that a court must examine the information and factual allegations made therein to determine if a defendant has received adequate notice of a charge. We therefore cannot say that its decision to deny Gautt relief was "contrary to . . . clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). We must separately examine, however, whether the state appeals court's decision constituted an "unreasonable application of" such law. *Id.*

**2**

**[3]** We begin our review of the state court's decision with the text of the information. In relevant part, the information stated:

> The District Attorney of the County of Los Angeles, by this Information alleges that:
>
> . . . .
>
> On or about January 10, 1998, in the County of Los Angeles, the crime of MURDER, in violation of PENAL CODE SECTION 187(a), a Felony, was committed by DARRELL ANTHONY GAUTT, who did unlawfully, and with malice aforethought murder SAMANTHA FIELDS, a human being. . . .
>
> It is further alleged that in the commission and attempted commission of the above offense, the said defendant(s), DARRELL ANTHONY GAUTT, per-

sonally used a firearm(s), to wit: HANDGUN, within the meaning of Penal Code sections 1203.06(a)(1) and 12022.5(a)(1) . . . .

It is further alleged that said defendant(s), DAR-RELL ANTHONY GAUTT *personally used* a fire-arm, a handgun, within the meaning of Penal Code sections 12022.5(a)(1) and *12022.53(b)*.

(Emphases added.) So the information cited only section 12022.53(b), not section 12022.53(d), *and* recited section 12022.53(b)'s defining element — that Gautt "personally used a firearm." It did not mention either section 12022.53(d) or that section's separate and distinct elements, not required for conviction under section 12022.53(b) — namely, that Gautt "intentionally and personally discharged a firearm and proximately caused great bodily injury." Therefore, the information did not provide any notice whatsoever of the enhancement ultimately applied.

This is not a situation, in other words, in which the numerical citation was incorrect but the verbal description of the crime corresponded to the crime of which the defendant was convicted. Nor is this a situation in which citation to one statute necessarily encompassed another lesser-included offense, thus sufficiently putting the defendant on notice of the need to defend against both statutes. *See, e.g.*, *Salinas v. United States*, 277 F.2d 914, 918 (9th Cir. 1960) (holding that the defendant had notice of lesser offenses included within an indictment charging a more aggravated degree of that offense because a first-degree arson charge for burning a house provides notice of a second-degree arson charge for burning a structure).

### 3

**[4]** Nor did any other language in the information suffi-ciently put Gautt on notice of a charge under section

12022.53(d). The information, for example, contains no suggestion of "proximate causation." Further, the words "personally used" do not subsume section 12022.53(d)'s "personal[ ] discharge[ ]" element, since Gautt could have "personally used" his handgun without ever firing it. *See* Cal. Jury Instr. Crim. 17.19 (explaining that the term "personally used a firearm," for purposes of California Penal Code sections 1203.06(a)(1), 12022.5(a), and 12022.53(b), "means that the defendant must have intentionally displayed a firearm in a menacing manner, intentionally fired it, *or* intentionally struck or hit a human being with it") (emphasis added); *People v. Johnson*, 38 Cal. App. 4th 1315, 1319-20 (Ct. App. 1995).

**[5]** In its briefs to this court, the state argues that the information's allegation of "malice aforethought" as an element of the murder charge was enough to put Gautt on notice that he would have to defend against section 12022.53(d)'s element of "intentionally and personally discharg[ing]," including its requirement that any discharge be intentional. But as California courts have defined the term "malice aforethought," its appearance in the information could not have been enough to adequately inform Gautt of an intent requirement.

**[6]** As defined under state law, "malice aforethought" encompasses theories of *both* "express" and "implied" malice. *See People v. Swain*, 12 Cal. 4th 593, 600 (1996) (citing Cal. Penal Code § 188). Malice "is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature." *Id.* at 600 (quoting Cal. Penal Code § 188); *see also People v. Saille*, 54 Cal. 3d 1103, 1114 (1991) (explaining that "express malice and an intent unlawfully to kill are one and the same"). Malice is implied under one of at least two distinct standards: either "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart," *id.* (quoting Cal. Penal Code § 188), or "when the killing results from an intentional act, the natural consequences of which are

dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life," *see People v. Dellinger*, 49 Cal. 3d 1212, 1215 (1989); *Swain*, 12 Cal. 4th at 601 (citing CAL. JURY INSTR. CRIM. 8.31, which defines "implied malice" for purposes of murder in the second degree).

[7] Under either implied malice definition, it cannot be said that the information's use of the term "malice aforethought" gave Gautt sufficient notice that he was being charged with "intentionally . . . discharg[ing]" a firearm, under section 12022.53(d). To meet the "malice aforethought" requirement, the state could have tried to show that Gautt intentionally committed *some act* in the course of killing Fields that supported an implied malice inference — for example, intentionally displaying and waving the handgun around in a taunting and threatening manner,[14] or intentionally striking Fields with it. Such a showing, however, would not have been sufficient to prove that Gautt "intentionally . . . *discharged*" a firearm, which is what 12022.53(d) requires. In short, nothing in the information — neither the statutes it cites nor the language it uses — adequately informed Gautt that he was being charged under section 12022.53(d).

**4**

Of course, if Gautt was ultimately convicted of the crime actually alleged in the information — a violation of section 12022.53(b) — his constitutional right to notice was not actually violated. *See Cole*, 333 U.S. at 199 (examining the content of the jury instructions and the state supreme court's judgment to find the basis of the defendants' conviction and, thus, to determine if there was a discrepancy between that

___

[14]In fact, this is exactly what the state set out to prove during Gautt's trial, a point evidenced by the prosecutor's closing argument. *See infra* pp. 6793-97.

conviction and the content of the information). In this case, however, there is no doubt that Gautt was convicted of a crime not charged — and sentenced to at least fifteen additional years as a result. The trial judge calculated his sentence using a twenty-five-years-to-life enhancement, the operative enhancement under section 12022.53(d), rather than the ten-year enhancement applicable under section 12022.53(b). The California Court of Appeal only compounded the constitutional injury by affirming Gautt's conviction and sentence and "amending" the abstract of judgment to reflect that his twenty-five-year-to-life sentence enhancement was imposed under section 12022.53(d), the statute *not* alleged in the information.

   **[8]** In sum, Gautt was charged with a violation of section 12022.53(b), carrying a ten-year enhancement, but convicted of a violation of section 12022.53(d), requiring proof of three additional elements and carrying a twenty-five-year-to-life enhancement. Gautt's constitutional right to be informed of the charges against him was violated by this stark discrepancy between the crime charged and the crime of conviction. The California Court of Appeal's conclusion to the contrary was unreasonable. Although that court correctly recited "clearly established Federal law, as determined by the Supreme Court of the United States" in its decision, it did not acknowledge that the *substance* of the information, not only the statute cited, never alleged the crime of conviction. Having failed to note this fatal flaw, the California Court of Appeal did not explain why there was no constitutional violation arising from the discrepancy, as we conclude there was. Given this critical oversight, the California court's analysis and judgment constituted "an unreasonable application of . . . clearly established Federal law." 28 U.S.C. § 2254(d)(1).

## C

   The state urges us to consider other sources, beyond the information, as evidence that Gautt was sufficiently informed

of a pending charge under section 12022.53(d). In particular, it asks us to mine the evidence it presented at the preliminary hearing and during its case-in-chief as well as the jury instructions issued by the trial judge for indications that Gautt knew or should have known that he was being tried under that statute and come prepared to defend against the additional elements never alleged in the information. The California Court of Appeal seemed to rely on at least some of this evidence, as well as the state's closing argument, in its decision.

**[9]** Our circuit has held that in certain circumstances — for example, when a defendant has argued that he received insufficient notice of a particular theory of the case — a court can examine sources other than the information for evidence that the defendant did receive adequate notice. *See Murtishaw v. Woodford*, 255 F.3d 926, 953-54 (9th Cir. 2001) (relying on the state's opening statement, evidence presented at trial, and the instructions conference to hold that the defendant had notice of the prosecution's felony-murder theory); *Calderon v. Prunty*, 59 F.3d 1005, 1009-10 (9th Cir. 1995) (looking to the opening statement and transcript from a hearing after the close of the prosecution's case to assess whether the defendant had notice that the prosecution was proceeding under a lying-in-wait theory of murder); *Morrison v. Estelle*, 981 F.2d 425, 428-29 (9th Cir. 1992) (holding that the defendant received constitutionally adequate notice of felony murder theory through the jury instructions the prosecutor submitted two days before closing arguments and from the overall evidence presented at trial); *Sheppard v. Rees*, 909 F.2d 1234, 1236 n.2 (9th Cir. 1989) (suggesting, in dicta, that "[a]n accused could be adequately notified of the nature and cause of the accusation by other means — for example, a complaint, an arrest warrant, or a bill of particulars" or "during the course of a preliminary hearing," and adding that the "[t]he Constitution itself speaks not of form, but of substance") (citing *Gray v. Raines*, 662 F.2d 569, 574 (Tang, J., specially concurring)). We have never held, however, that these same non-charging-document sources can be consulted when the

defendant claims, like Gautt, that he never received sufficient notice of the actual underlying *charge* — carrying a much heavier penalty than the crime alleged — rather than merely the operative theory of the case.[15] Finally, and most importantly, the Supreme Court — the only court whose jurisprudence is relevant for purposes of AEDPA — has never held that non-charging-document sources can be used to satisfy the Constitution's notice requirement in the present context.[16]

This stance strikes us as an exceedingly sensible one. Otherwise, the state would almost always be able to point to *some* portion of its case-in-chief — some shred of evidence presented during the trial or a handful of discrete questions asked during the course of a direct examination — as proof of "notice" to the defendant. And yet, it is not uncommon for prosecutors to "over-prove" their cases — that is, to introduce evidence that could support a more severe charge, in the hope, perhaps, of conveying to the jury the seriousness of the crime.

---

[15]Some of the aforementioned cases can be distinguished on other grounds as well. In *Calderon*, for example, we looked to non-charging-document sources only to corroborate our initial conclusion that the allegation at issue had, indeed, been sufficiently made in the information. 59 F.3d at 1009. In *Sheppard*, the state fully conceded that it had failed to give the defendant sufficient notice of its felony-murder theory. 909 F.2d at 123. Although in subsequent analysis we looked to non-charging-document sources and observed that "the prosecutor 'ambushed' the defense with a new theory of culpability after the evidence was already in, after both sides had rested, and after the jury instructions were settled," we did so only to bolster the conclusion that this error could not have been "harmless" because the prosecution's theory "was neither subject to adversarial testing, nor defined in advance of the proceeding." *Id.* at 1237-38.

[16]The Supreme Court has held that when determining whether a defendant's guilty plea was voluntary — in the sense that the defendant had "real notice of the true nature of the charge against him" — a court can look to the formal charges as well as to the record for evidence that the trial judge or defense counsel explained "the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit." *Henderson v. Morgan*, 426 U.S. 637, 645-47 (1976) (citing *Smith v. O'Grady*, 312 U.S. 329, 334 (1941)). The Court, however, has not applied *Henderson* outside the plea context.

When that happens, the defendant may decide not to rebut or refute evidence supporting only the higher charge, concentrating his defense instead on the lesser charge actually at issue.

Even more troublesome is the idea that jury instructions or closing arguments — sure signs that the *end* of a trial is drawing near — could substitute for sufficient notice to a defendant of the charges that have been leveled against him. While an instruction may be informative in indicating the common understanding of the parties and the court as to what was at stake in the trial, it cannot itself serve as the requisite notice of the charged conduct, coming as it does *after* the defendant has settled on a defense strategy and put on his evidence. The same limitations are generally true of closing arguments as well. After all, if the purpose behind a defendant's constitutional right to notice is "to enable him to prepare his defense," *James*, 24 F.3d at 24, a rule that allows the state to satisfy this due process consideration via two late-stage trial events can hardly advance that objective.

Nevertheless, for purposes of our analysis today, we will assume — without deciding — that such sources can be parsed for evidence of notice to the defendant and that the California Court of Appeal did so use those sources.[17] Yet, even after consulting these sources, we still conclude that none sufficiently alerted Gautt to a potential sentence enhancement under section 12022.53(d). Even taken together, these sources are insufficient. If anything, they bolster the contrary conclusion — that the state never asked the jury to decide whether Gautt intentionally discharged his handgun.

---

[17]As noted earlier, it is not entirely clear from the text of the California Court of Appeal's opinion whether that court actually relied on trial evidence, jury instructions, and the closing argument when rejecting Gautt's right to notice claim, or whether it considered these sources solely for purposes of Gautt's *Apprendi* claim. *See supra* pp. 6782-84. We err on the side of caution, however, assume that the state appeals court did rely on these portions of the record when dismissing Gautt's Sixth Amendment claim, and review its analysis accordingly.

As a result, the state appellate court's decision constituted "an unreasonable application of" what we assume for present purposes to be "clearly established Federal law." 28 U.S.C. § 2254(d)(1).

[10] The state contends, first, that evidence it presented at a preliminary hearing should have alerted Gautt to a charge under section 12022.53(d). In particular, in its briefs to this court, the state points to testimony that Gautt was "violently upset" with Fields, that he "stood over Fields while she sat in chair scared and whimpering," and that Gautt did not try to help Fields after shooting her but rather ordered others in the room to help him conceal the crime. While such evidence may suggest that Gautt acted in an especially callous manner, it does not indicate that Gautt pulled the trigger on purpose — as opposed to, for example, threatening her with the gun, which then went off unintentionally. So the evidence introduced at the preliminary hearing could not have been enough to put Gautt on notice of a potential sentencing enhancement under section 12022.53(d), requiring an intention to discharge the handgun.

Moreover, at the end of the preliminary hearing, the judge found true "that the defendant was personally armed within the meaning of . . . 12022.53(b)." She did not find probable cause of any of the additional elements of section 12022.53(d), nor did she mention that section. At the end of the preliminary hearing, consequently, the only reasonable conclusion Gautt and his lawyer could have drawn is that he would have to defend against only section 12022.53(b), not against the additional elements contained in section 12022.53(d).

The evidence the state presented at trial provides a similarly flimsy basis for determining that Gautt had notice of a potential conviction for "intentionally and personally discharg[ing]" the handgun. The only evidence the government points to in its briefs that is, in fact, uniquely relevant to a

showing of intentional and personal discharge is testimony from a firearms expert, who explained that the design of Gautt's handgun made it unlikely that his weapon discharged accidentally. This piece of evidence alone, however, was insufficient to put Gautt on notice that the state's objective was to secure a sentencing enhancement under 12022.53(d), when the charging document said otherwise, the other evidence presented at trial supported only the "personal[ ] use[ ]" allegation explicitly set forth in the information, and the thrust of the firearm expert's testimony was subject to other interpretations.[18]

**[11]** The government also asks us to consider the trial judge's instructions to the jury as another source of notice to Gautt. As we have already explained, though, those instructions were particularly muddled, given that the trial judge rattled off the citation to the latter statute but the substance of the former. *See supra* pp. 6772-73. As a result, and given their timing, the instructions could not have been enough, alone, to inform Gautt adequately of a charge under section 12022.53(d), rather than section 12022.53(b).

Finally, we turn to the content of the prosecution's closing argument, which we believe is the clearest indication that the

---

[18]The federal district court, which denied Gautt habeas relief, recognized this point. According to that court, the state's firearms expert testified about the loaded and cocked nature of the gun and the fact that it was pressed up against the victim's clothing at the time she was shot. *Gautt v. Lewis*, No. CV 01-6771-PA, slip op. at 23 (C.D. Cal. Feb. 27, 2003). The district court concluded that this evidence should have put petitioner on notice "that the prosecutor intended to try and prove that petitioner *either* intentionally fired the weapon *or* fired it as a result of brandishing it in a reckless manner." *Id.* (emphases added). Based on this interpretation of the testimony, Gautt could have believed that the prosecution sought only to prove the second point — that he fired the handgun after recklessly brandishing it — rather than the first — that he intentionally discharged the gun. That second point sufficed for a second-degree murder conviction and would have satisfied the section 12022.53(b) enhancement actually charged.

state never sought to prove that Gautt "intentionally . . . discharged" the handgun — and that the prosecutor, therefore, could not have been behaving over the course of the trial in a manner that would have put Gautt on notice of such a charge. We quote from the prosecution's closing argument at length:

> The defendant in this case, I'm asking you to convict him of second degree murder. The verdict form will say "murder." I'm not proceeding against the defendant on first degree murder. If I were, I would have to prove intent to kill. To convict the defendant of first degree murder, you have to find that he intended to kill. That means that he meant for her to die. I'm not asking you to do that.

> I think there's room for arguing for that, but I won't ask you to do that in this case. I'm just asking you to convict the defendant of second degree murder because it's warranted on the facts of this case.

> Forget about express malice because that applies to first degree murder, and we don't have that. What we care about in this case is implied malice. A person is guilty of second degree murder if they kill someone with implied malice, and the law in the State of California holds, if you quali[f]y for these three things, if you commit an act so dangerous that it warrants holding you accountable for murder, then you're accountable for murder, and that's what implied malice is. The killing has to have resulted from an intentional act.

> I want to stop here, and I'll come back to it. I want to make this really clear. I want you to be clear, when it says [ ]intentional act,[19] *that doesn't mean*

---

[19]Although the transcript reads "unintentional act," we know the prosecutor meant to say "intentional act" because the implied malice jury instruction uses the word "intentional."

*he intentionally pulled the trigger. There's room for arguing that. That is not required. The intentional act need only be, in this case, the act of having a loaded gun. The act of pointing a loaded gun.*

*Even if you were to accept the defendant's version of waving around a loaded gun, the intentional act is having the gun and pointing it in a dangerous manner and waving it in a dangerous manner. That's the act. Not the pulling of the trigger. . . .*

(Emphases added.)

Later in her argument, the prosecutor continued:

*It does not matter whether he pulled the trigger or not. . . .*

*. . . .*

He was standing over here pointing a loaded handgun at her, and he pulled the trigger. *Whether he truly meant to pull that trigger or not, he pulled the trigger.* His finger was on that trigger. It had to have been. That gun didn't just go off.

You had the firearms expert who testified the trigger pull is five pounds, and it's normal on that gun. Nothing wrong with that gun. That gun went off because he was mad and he had his finger on the trigger, and it's a small gun and small trigger area.

There's no way, and there's no testimony in this case she got up and somehow got her finger in that trigger hole and forced him to pull the trigger or pushed on his finger. There's no evidence of that in this case. *He pulled the trigger. I submit to you at that moment he meant to. But that's not at issue in*

*this case because I'm not asking you to find he intended to do it.*

What I'm asking you and hope actually showing you, looking at the law and applying the facts in this case, *that killing in this case resulted from the intentional act of pointing a loaded handgun at Samantha Fields with his finger on the trigger*, and that [the] natural consequence[ ] of that act [is] certainly dangerous to human life.

There is no disputing that. *And . . . that act was deliberately performed as he meant to do it.* His purpose was to scare, *but he meant to pull out that gun and point it* and he did it with knowledge of the danger and with . . . total disregard for the danger to life that it posed . . . .

(Emphases added.)

The prosecutor only mentioned the words "personal discharge" toward the close of her final argument, as she read the court-prepared verdict form aloud to the jury. As we explained earlier, though, that form was flawed, describing as it did section 12022.53(b), not section 12022.53(d), as an offense that contained the elements of personal discharge and proximate causation, but failing also to mention section 12022.53(d)'s element of intent. *See supra* 6774-75. It should come as no surprise then that when the prosecutor recited this portion of the verdict form to the jury, she simply parroted its errors. So even when the prosecutor came closest to addressing the substance of section 12022.53(d), she still failed to mention its most critical element — that of intentional discharge. Consistent with that omission, the prosecutor told the jury — three times — that to convict on the personal discharge charge, intent to pull the trigger was irrelevant; all they needed to find was that "he's the one that had his finger on the trigger . . . [h]e had his finger on the trigger when the mur-

der took place . . . because he had his finger on the trigger and because the murder happened, that's what caused the murder or the death."

**[12]** The prosecutor's closing argument thus makes clear that the state did not understand the case as one requiring it to prove that Gautt intentionally discharged his handgun and did not so present the case to the jury. Instead, the state emphasized to the jury that all the prosecution needed to prove was that Gautt intentionally displayed, pointed, or waved the handgun in a "dangerous manner," and had his hand on the trigger when it went off. Those facts were certainly enough to secure a conviction for "personally using" a firearm, the element endemic to section 12022.53(b). Moreover, while the prosecutor told the jury that she might have been able to argue from the evidence presented that Gautt intended to pull the trigger — "He pulled the trigger. I submit to you at that moment he meant to" — she quickly backed away from the burden of having to prove the element of "intentional[ ] . . . discharge[ ]," as she also told the jury that "that's not at issue in this case because I'm not asking you to find he intended to do it."

The purpose behind a closing argument is "to explain to the jury what it has to decide and what evidence is relevant to its decision." *Sandoval v. Calderon*, 241 F.3d 765, 776 (9th Cir. 2000). The government's closing argument is that moment in the trial when a prosecutor is compelled to reveal her own understanding of the case as part of her effort to guide the jury's comprehension. In Gautt's case, the prosecution's final argument makes clear that the prosecutor did not see herself as having the burden to convince the jury beyond a reasonable doubt that the handgun was "intentionally . . . discharged." That being the prosecution's understanding, there is no reason in the world Gautt or his lawyer would have had a different understanding — that he had to defend himself against a different set of allegations, defining an extremely serious

enhancement and resulting in a longer sentence than the enhancement alleged in the information.

**[13]** In conclusion, even if we assume that Supreme Court precedent allows us to consider sources beyond the charging document when deciding whether Gautt had been given constitutionally sufficient notice of a charge under section 12022.53(d), a close examination of those sources does not alter, but reinforces, our earlier outcome. We remain steadfast in our conviction that Gautt's constitutional right to be informed of the charges against him was violated when he was charged under section 12022.53(b) but had his sentence enhanced pursuant to the harsher penalties afforded by section 12022.53(d), and that the state court was "objectively unreasonable" in concluding otherwise. *See Andrade*, 538 U.S. at 75.

**IV**

We must now consider how best to cure this constitutional defect. Gautt argues that his conviction under section 12022.53(d) should be automatically reversed; the state, on the other hand, urges us to undertake a harmless error review. Existing case law on this point is less than clear. As a result, although we see many arguments in favor of Gautt's position, we take the more cautious route here and assume, without deciding, that harmless error review governs. Under this more stringent mode of analysis, Gautt prevails.

We begin by explaining our hesitation in automatically reversing Gautt's conviction under section 12022.53(b), the route the Supreme Court took in both *Cole*, *see* 333 U.S. at 202, and *Stirone*, *Cole*'s Fifth Amendment counterpart, *see* 361 U.S. at 219. In *Stirone*, in particular, the Court emphasized that a variance between the charges in the indictment and the evidence presented during the trial allowed the jury to convict on grounds not charged in the indictment and "destroyed the defendant's substantial right to be tried only on

charges presented in an indictment returned by a grand jury. Deprivation of such a basic right is far too serious to be treated as nothing more than a variance and then dismissed as harmless error." *Id.* at 217. Instead, the Court characterized the error as "fatal," and reversed the conviction. *Id.* at 219. In so doing, it specifically cited to *Cole*. *Id.*

Our own circuit has employed both automatic reversal and some form of harmless error review when assessing appeals involving a "right to notice" claim. *Compare Sheppard*, 909 F.2d at 1237 (automatically reversing a conviction), *with Givens*, 786 F.2d at 1381 (applying harmless error review).[20] *Givens*, however, held that the notice error is harmless only if defendants received notice through other means besides the charging document. 786 F.2d at 1381. Thus, although *Sheppard* and *Givens* may at first appear in tension, they both hold that if a defendant does not receive notice of a charge through a charging document *or* through some other means, the conviction must be reversed.

A competing factor gives us pause, however, and would require a close examination before we could accept automatic reversal as the appropriate course of action here. Both *Cole* and *Stirone* were decided before the Supreme Court distinguished between "structural" constitutional errors that can be cured only through automatic reversal and those errors that can be corrected through harmless-error review. *See Chapman v. California*, 386 U.S. 18, 22-23 (1967) (holding that "some constitutional errors . . . in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless," while

---

[20]In *Jones v. Smith*, 231 F.3d 1227 (9th Cir. 2000), we also assumed a structural error where the defendant had not been given notice of a specific charge. For the reasons set forth below, though, we do not base our analysis on that assumption. More generally, we note that *Jones* bases its analysis on the Fifth Amendment's right to a grand jury indictment, notwithstanding that this right has not been incorporated to apply to the states.

other "constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error"). In fashioning these two categories, *Chapman* explicitly referred to three constitutional errors as falling into the former group, all of which had been recognized by earlier Supreme Court decisions. *See id.* at 23 n.8 (the admission of a coerced confession, deprivation of a right to counsel, and a partial judge). It made no mention, however, of the right to "notice of the specific charge" that had been set forth pre-*Chapman* in *Cole*, 333 U.S. at 201, or of the right not to be convicted of grounds not set forth in the indictment set forth in pre-*Chapman Stirone*, 361 U.S. at 217.

Since *Chapman*, the Supreme Court has periodically re-recited this list of "structural errors" and, on occasion, expanded it. *See Arizona v. Fulminante*, 499 U.S. 279, 310 (1991) (adding the "unlawful exclusion of members of the defendant's race from a grand jury," "the right to self representation at trial," and "the right to a public trial" to *Chapman*'s list of structural errors); *Sullivan v. Louisiana*, 508 U.S. 275, 281-82 (1993) (adding constitutionally deficient reasonable-doubt instructions to the list of "structural error[s]"); *Johnson v. United States*, 520 U.S. 461, 468-69 (1997) (reciting the list of structural errors, as of *Sullivan*); *Neder v. United States*, 527 U.S. 1, 8 (1999) (same); *Washington v. Recuenco*, 126 S. Ct. 2546, 2551 (2006) (same). Never, though, has the Court included the rights identified by *Cole* or *Stirone* on its short, purposely limited roster of structural errors. *See Fulminante*, 499 U.S. at 306 (recognizing that "most constitutional errors can be harmless"). Yet the Court has never included the rights articulated in *Cole* and *Stirone* on a list of mere "trial" errors, subject only to harmless-error review, either. *See id.* at 306-07 (detailing seventeen constitutional errors that can be harmless, without mentioning a violation of one's right to notice).

We are thus at a bit of loss as to how to interpret these clearly non-exhaustive lists. On the one hand, and for reasons

already stated, we hesitate to pronounce the constitutional violation in question structural in nature, without an explicit "green light" from the Court. While our own circuit certainly adopted an automatic reversal approach in *Sheppard*, we cannot ignore the fact that *Sheppard* predates *Fulminante*, *Sullivan*, *Johnson*, and similar Supreme Court cases, all of which stressed the limited number of "structural errors." On the other hand, the Court's prior characterization of the right to be informed of charges against you — as both "*basic* in our system of jurisprudence," *Oliver*, 333 U.S. at 273 (emphasis added), and as a "principle of procedural due process" that is unsurpassed in its "clearly established" nature, *see Cole*, 333 U.S. at 201 — makes us inclined to believe that this type of constitutional deprivation must be structural, because it "affect[s] the framework within which the trial proceeds, rather than simply [being] an error in the trial process itself," *Fulminante*, 499 U.S. at 310; *see also Brecht v. Abrahamson*, 507 U.S. 619, 629-30 (1993) (describing structural defects as those that "infect the entire trial process" and "which defy analysis by 'harmless-error' standards" (quoting *Fulminante*, 499 U.S. at 309) (internal quotation mark omitted)).

Fortunately, and as stated earlier, we need not resolve this question today. For, even if harmless-error review applies, the due process problem in this case was not harmless.

Under AEDPA, "even where the state court has committed constitutional error under § 2254(d), 'habeas relief may still be denied absent a showing of prejudice.' " *Buckley v. Terhune*, 441 F.3d 688, 697 (9th Cir. 2006) (en banc) (quoting *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004), *cert. denied* 2007 WL 1174407 (U.S. Apr. 23, 2007)). To determine prejudice, we apply the harmless-error standard from *Brecht. See Bains v. Cambra*, 204 F.3d 964, 977 (9th Cir. 2000) (holding that federal courts "always should apply the *Brecht* standard when conducting their own independent harmless error review, regardless of what, if any, type of harmless error review was conducted by the state courts").

Under this standard, we grant relief where we believe the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946) (internal quotation marks omitted)). As the Supreme Court has explained, under the *Brecht* standard, we ask, "Do I, the judge, think that the error substantially influenced the jury's decision." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). In a case where the record is so evenly balanced that a "conscientious judge is in grave doubt as to the harmlessness of an error," the petitioner must prevail. *Id.* at 438. Thus, in the course of a *Brecht* inquiry, the state bears the "risk of doubt." *See Valerio v. Crawford*, 306 F.3d 742, 762 (9th Cir. 2002) (en banc).

**[14]** Applying this standard, and after carefully reviewing the record before us, we hold that the state's failure to inform Gautt of a charge under section 12022.53(d) was prejudicial under *Brecht*. We cannot conclude otherwise, given the facts before us.

In particular, we cannot ignore the fact that Gautt was sentenced fifteen-years-to-life for second-degree murder, but had his sentence enhanced twenty-five-years-to-life under section 12022.53(d), rather than ten years under section 12022.53(b). In other words, the enhancement alone comprised more than half of his sentence,[21] and fifteen-years-to-life — as much as the underlying second-degree murder sentence — more than the enhancement of which he had notice. Had Gautt realized that so much hinged on whether the jury found that he discharged the handgun *intentionally*, we have no doubt that he would have prepared a different defense and made different tactical choices.

---

[21]As noted earlier, Gautt was sentenced to a term of imprisonment of forty-nine years and eight months to life. *See supra* pp. 6776 & n.8.

For example, the record before us indicates that Gautt concentrated at trial on defending against the second-degree murder charge rather than on the enhancement. This was a perfectly sensible focus given the charging document, even though the chosen defense to second-degree murder was, as the prosecution pointed out, exceedingly weak.[22] Conviction for the "personal use" enhancement was pretty much a foregone conclusion if there was a second-degree murder conviction, as Gautt clearly did "use" the gun by flailing it around and threatening the victim, and as that enhancement had no proximate cause or intent to discharge element. So, with good reason, Gautt's counsel devoted no separate attention to that enhancement. Yet the government's direct evidence that Gautt pulled the trigger purposely, rather than accidentally, was somewhat scant. Gautt's lawyer may well have chosen to concentrate on refuting that evidence, rather than putting on a weak defense to second-degree murder, had he known that a fifteen-year-to-life additional sentence turned on it. For instance, he could have presented evidence about Gautt's mental state at the time of Fields's shooting, relying on the fact that Gautt had used cocaine shortly before Fields's murder to rebut the notion that his client was capable of forming the mens rea required under section 12022.53(d).

Perhaps most importantly, had Gautt been aware of a potential conviction under section 12022.53(d), he would most probably have structured his closing argument differently, using his last opportunity before the jury to drive home the point that while he held the gun in the moments before Fields's murder, and may even have recklessly and consciously disregarded the known risk that the gun could go off and kill, he did not *intend* to pull the trigger. As the record stands, Gautt's lawyer never addressed the intent to discharge point during his closing argument, even in the alternative — i.e., "even if you find Gautt guilty of second-degree murder,

---

[22]The prosecutor argued, fairly convincingly, that even on the defendant's version of events, he would still be guilty of second-degree murder.

you should not find him guilty of personal discharge of a fire-arm because if he set off the trigger, he did not do so intentionally." He had no reason to, given the prosecutor's repeated disavowal, during her own closing argument, of any need for the jury to find the *intentional* discharge of the handgun. Moreover, the prosecution's decision to charge only second-degree murder and expressly and repeatedly to disavow any need for the jury to find intentional discharge of the firearm is the strongest of indications that finding such an intent beyond a reasonable doubt was far from a foregone conclusion, given the available evidence. Instead, such a finding might well have been headed off by a properly focused defense.

We have little doubt that Gautt's understandable failure fully and adequately to focus his defense on disproving intent to discharge the gun and to properly frame his closing argument resulted from the failure to notify him of any need to do so, and that that decision had a substantial influence on the jury's verdict. The result was that the trial court enhanced his sentence twenty-five years to life, instead of the ten years that had been so clearly alleged on the face of the information, without providing Gautt a fair opportunity to defend against the more stringent enhancement. The state's error was not harmless, and habeas relief is warranted.

* * * *

On remand, the district court shall grant a conditional writ of habeas corpus, ordering that the state release Gautt unless it re-sentences him. We note that the jury found that Gautt "personally used" the handgun for purposes of two different statutes, sections 12022.5(a)(1) and 1203.06(a)(1), and the jury's finding that Gautt "personally discharged" the handgun is a finding of "personal use."[23] Thus, nothing in this opinion precludes the state from re-sentencing Gautt under the ten-

---

[23]*See* CAL. JURY INSTR. CRIM. 17.19.

year sentence enhancement provided for by section 12022.53(b).

**REVERSED AND REMANDED.**