**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARVIN VERNIS SMITH,
*Petitioner-Appellee*,

v.

RAUL LOPEZ, Warden,
*Respondent-Appellant*.

No. 12-55860

D.C. No.
8:11-cv-01076-ODW-MRW

OPINION

Appeal from the United States District Court
for the Central District of California
Otis D. Wright II, District Judge, Presiding

Argued and Submitted
March 6, 2013—Pasadena, California

Filed September 23, 2013

Before: Sidney R. Thomas and Andrew D. Hurwitz, Circuit
Judges, and Ralph R. Beistline, Chief District Judge.[*]

Opinion by Judge Thomas

---

[*] The Honorable Ralph R. Beistline, Chief District Judge for the U.S.
District Court for the District of Alaska, sitting by designation.

## SUMMARY[**]

### Habeas Corpus

The panel affirmed the district court's conditional grant of a 28 U.S.C. § 2254 habeas corpus petition claiming that petitioner was denied his right to notice of the nature of the accusations against him when the trial judge gave an aiding-and-abetting jury instruction.

The panel explained that, although the criminal information charging petitioner with first-degree murder was initially sufficient to put him on notice that he could be convicted either as a principal or as an aider-and-abettor, the prosecution's conduct throughout the pretrial and trial proceedings affirmatively led petitioner to believe that the prosecution would not rely on an aiding-and-abetting liability theory. The panel held that the aiding-and-abetting jury instruction, given only after the prosecution requested it at the jury instructions conference, violated petitioner's right to notice of the nature of the charges against him, as well as the right to prepare a defense. The panel held that the error was not harmless.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Kamala Harris, Attorney General, Julie L. Garland, Senior Assistant Attorney General, Kevin Vienna, Supervising Deputy Attorney General, Robin Urbanski (argued), Deputy Attorney General, San Diego, California, for Respondent-Appellant.

Dennis P. Riordan (argued), Donald M. Horgan, and Gary K. Dubcoff, Riordan & Horgan, San Francisco, California, for Petitioner-Appellee.

**OPINION**

THOMAS, Circuit Judge:

In this appeal, we consider whether a habeas petitioner's constitutional right to notice of the nature of the accusations against him was violated. We agree with the district court that it was, and we affirm the judgment granting federal habeas relief.

I

A

On the evening of December 15, 2005, police officers went to the home of Marvin and Minnie Smith in response to Marvin Smith's 911 call reporting a burglary in progress. In the upstairs bedroom, the police found Minnie Smith's body on the floor. She had been killed by a crushing blow to her head from a fireplace log roller, and her body had other injuries that may have been inflicted before her death. Her

hands were bound by a wire clothes hanger, and her feet had been bound by a strip of duct tape that was found near the body. Parts of the house appeared to have been ransacked, and valuable jewelry was missing from the bedroom.

Several weeks later, Smith was arrested for the murder of his wife. A felony complaint charged Smith with "unlawfully and with malice aforethought kill[ing] MINNIE SMITH" in violation of California Penal Code § 187(a).

At the preliminary examination hearing, the prosecution presented the testimony of Detective Christopher McShane. Detective McShane testified that he had interviewed David Moraga, Smith's cell mate for six months, and that Moraga had told Detective McShane that Smith made incriminating statements while they were celled together:

> Q. And did [Moraga] indicate to you whether Marvin Smith had told him anything about the killing of Minnie Smith?
>
> A. Yes.
>
> Q. What did [Moraga] say to you he'd heard from Marvin Smith?
>
> A. He said that Marvin had told him that he had to get rid of his wife because she was standing in the way of his future plans; that she was threatening to divorce him and he wasn't going to give up half of his property he worked so hard for his entire life. Said on the day of the murder he had left the house earlier than he normally

does, that he left, he took the jewelry and the money out of the safe with him. He staged it to look like a home invasion robbery. He left a window open. He exited the house without setting the alarm. He went through the front door of the house, and that he went to work that day.

On cross-examination, Detective McShane admitted that Moraga was vague on the details of the murder:

> Q. Did Mr. Moraga, Detective, tell you the manner in which the killing was carried out?
>
> A. He said that she was beat up real bad.
>
> Q. Did he give any further details?
>
> A. No.
>
> [ . . . ]
>
> Q. And [Moraga] didn't really have any information about who specifically did the homicide, did he?
>
> A. Marvin never told him specifically who did it, no. . . .
>
> [ . . . ]

Q. [Moraga] didn't know any of the details of
   the homicide itself and how it was carried
   out, correct?

A. Correct.

Q. Did he tell you that the homicide was
   committed before Mr. Smith left the house
   or was he vague on that point?

A. He was vague.

The court found probable cause to try Smith on the charge
in the felony complaint, and the district attorney then filed an
information reciting the same charge of first-degree murder.

At Smith's trial, the prosecutor said in his opening
statement that "the evidence will show that that man over
there at the end of counsel table, wearing the nice sweater,
murdered his wife of 27 or 28 years, and then he staged the
crime scene to make it look like a burglary and to avoid
detection." Later, the prosecutor said that "the evidence will
show" that "the defendant bludgeoned [Minnie Smith] to
death, bound her arms behind her with a wire coat hanger,
and then staged the scene to look like a burglary." The
prosecution asserted that Smith killed his wife because he did
not want to divide his substantial assets with her in the event
of a divorce.

In the middle of the prosecution's opening statement,
defense counsel learned that Moraga had refused to testify.
During a recess, Moraga's attorney told the court that his
client would invoke his Fifth Amendment privilege if called
to the stand. The judge concluded that it was unlikely

Moraga would testify and ordered the parties not to discuss the prospect of his testimony in their opening statements. The trial judge also granted defense counsel's request to delay her opening statement for nearly two weeks, agreeing that Moraga's potential testimony had been significant and that the defense should be given an opportunity to reengineer its opening statement to remove references to Moraga.

In her opening statement, defense counsel offered two reasons why Smith could not have killed his wife. First, she told the jury that the evidence would show that Smith's whereabouts were accounted for at the time of his wife's murder. Second, she said that the evidence would show that Smith was physically incapable of bludgeoning his wife to death with a heavy fireplace tool because of major shoulder surgery he had undergone a few weeks before the murder. She also told the jury that "there may be evidence that points to other people, but you won't be able to put it all together and know who did it."

In its presentation, the prosecution called over forty witnesses and offered over 220 exhibits. The prosecution presented evidence that Smith was unfaithful to his wife for many years, that his wife was threatening to divorce him, and that he told one of his former employees, Sam Matthews, that the "only way" he or his wife would get out of their marriage was "to die," because he was "not going to give Minnie half of what [he] got so some other man can live off of it."

The prosecution also presented evidence that Smith's DNA was recovered from both the murder weapon and his wife's body. The prosecution also showed that police recovered the missing jewelry from the trunk of Smith's car, and that the duct tape found on the jewelry box was from the

same roll as the duct tape used to bind his wife's ankles. Finally, the prosecution presented the expert testimony of a criminologist who opined that the disarray in the Smiths' house was staged.

Like the prosecution, the defense presented a large volume of evidence, calling nearly thirty witnesses and submitting nearly one hundred exhibits. To support Smith's alibi, defense counsel presented evidence of Smith's movements on December 15, 2005. To establish that the seventy-year-old Smith was incapable of committing the murder, defense counsel presented medical evidence showing that he underwent major rotator cuff surgery weeks before the murder, and that surgery would have prevented him from swinging a fireplace tool with enough force to deal the fatal blow.

The defense insinuated that Matthews, and not Smith, murdered Minnie. On cross-examination, Matthews admitted that he owed Smith $15,000 and knew the location of several safes in the Smiths' house. Defense counsel also elicited testimony that, at the time Matthews spoke with investigators, he knew details about the crime scene that the investigators hadn't told him and that he hadn't learned from news reports. In particular, defense counsel asked Matthews about statements he made to investigators in which he imagined how Smith would have gone about the murder:

> Q. And didn't you tell the police that Mr. Smith wouldn't have done it alone?
>
> A. Yeah, I might have said that.

Q. And didn't you say that he would have done it with Nelson Nealy?

A. Probably said that, too.

Q. Yes or no?

A. Yes.

Q. And didn't you say that "he and Nelson Nealy would have done it, and then they would have gone downstairs afterwards and had a drink"?

A. No I didn't say that.

Contrary to Matthews's testimony, he did tell investigators that whoever killed Minnie Smith went downstairs and had a drink afterward. In fact, a cup of Hennessy cognac was sitting on the downstairs bar when police discovered Minnie Smith's body.

After the defense rested, the trial court held a conference to discuss jury instructions. The prosecution proposed an aiding-and-abetting instruction. The prosecutor argued that the instruction was needed because "if [Smith] didn't swing the murder weapon, it doesn't mean he's not guilty of the crime." Defense counsel strenuously objected, explaining that she previously was unaware that the prosecutor was relying on an aiding-and-abetting theory. She emphasized that throughout the case, there had been no sign that the prosecution was relying on such a theory, and asserted that the instruction would invite the jury to "speculate about a

universe of possibilities for which there's absolutely no evidence."

The trial judge nevertheless agreed to give the aiding-and-abetting instruction. The judge believed he had a sua sponte duty to do so because there was "considerable evidence" that even if Smith was incapable of swinging the log roller, "he may very well have been an aider and abettor." The judge expressed concern that without an aiding-and-abetting instruction, the jurors would be left without legal guidance in the event they accepted the defense theory but still believed Smith was involved in the murder. In expressing this concern, the trial judge acknowledged that both sides had presented "strong cases" concerning Smith's ability to inflict the fatal blows.

The parties gave closing arguments immediately after the lunch recess. The prosecutor did not mention aiding and abetting in his initial argument. Instead, he argued that Smith was healthy and strong enough to swing the log roller himself. The prosecutor also emphasized that *only* Smith, and "not some unidentified perpetrator," could have swung the fireplace tool because Smith's was the only DNA found on the tool besides that of Minnie and a crime lab technician.

In her closing argument, defense counsel addressed the possibility that the prosecutor would discuss an aiding-and-abetting theory in rebuttal. After arguing that Smith could not have perpetrated the murder, defense counsel told the jury that the prosecutor might argue "a new theory in this case, for the first time ever, here today." Defense counsel then attempted to respond to that theory:

Now that we've proven [Smith] couldn't have done it, proven there wasn't time, there's going to be a phantom second guy. And Mr. Smith is going to be with that phantom second guy. And that second guy is going to be doing the killing and the lifting and whatnot, even though the prosecution's DNA experts say there's no foreign DNA found in the house.

Defense counsel then suggested that the prosecution was introducing the theory late in the proceedings because "any time we pound down the prosecution theory, they pop up with a new one."

In rebuttal, the prosecutor acknowledged that aiding and abetting was not his theory of the case, but invited the jurors to consider the theory anyway:

Look, the prosecution theory of the case is the defendant murdered his wife. Left-handed, two-handed, right-handed, using a side blow, it doesn't matter to me. I don't care which one happened. It doesn't matter. . . .

But the fact of the matter is—and this is just the law—the defendant killed his wife. He wielded that fireplace tool himself. But if you don't believe that—or let's say three of you get back in the deliberations and say, I just don't know. I know he's involved. I know he's lying about the jewelry. He's got the jewelry. He's got the duct tape that matches duct tape from this crime scene. I know he's

in on it, but I'm not sure that he could have
wielded that weapon.

Well, guess what? You don't have to be.
And that's the law . . . .

The prosecution theory: he killed her before
he left the house and he went to work. Does
it matter if you buy that theory? No, it
doesn't, because he doesn't even have to be
there. He doesn't even have to be the one
who wielded the murder weapon. He was.
And he did.

And half of you can think it was one way and
the other half think it's the other way, doesn't
matter. That's still a guilty verdict.

After closing arguments, the trial judge rejected defense
counsel's renewed request to not give the aiding-and-abetting
instruction. The trial judge then instructed the jury on aiding-
and-abetting liability in addition to principal liability. In a
general verdict, the jury convicted Smith of first-degree
murder as charged in the information.

B

On direct appeal, the California Court of Appeal reversed
Smith's conviction. Citing *People v. Perez*, 113 P.3d 100,
104 (Cal. 2005), the court explained that before a jury may
convict a defendant under an aiding-and-abetting theory, the
prosecution must prove that someone other than the defendant
committed the crime. The court then held that because "no
proof was presented that another person participated in

accomplishing" the killing of Minnie Smith, "the evidence failed to support the [trial court's] giving of aiding and abetting instructions in this case." The court noted that "the prosecutor proceeded solely on the theory defendant killed his wife." Finally, the court held that the trial court's instructional error prejudiced Smith's trial.

On review, the California Supreme Court vacated the court of appeal's decision and remanded for reconsideration of the prejudice determination in light of *People v. Guiton*, 847 P.2d 45 (Cal. 1993). *Guiton* had applied the U.S. Supreme Court's decision in *Griffin v. United States*, 502 U.S. 46 (1991), holding that where a jury is presented with two theories of guilt, one factually supported and the other not, "the appellate court should affirm the judgment unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory." 847 P.2d at 53.

Applying the *Guiton*/*Griffin* prejudice standard, the court of appeal then concluded that the factually unsupported instruction was not prejudicial error because there was no affirmative indication in the record that the jury based its guilty verdict *solely* on aiding and abetting.[1] The court pointed first to the prosecutor's own ambivalence in rebuttal about the aiding-and-abetting theory. The court also cited the jury's requests during deliberations to examine the fireplace

---

[1] In doing so, the court of appeal apparently maintained its previous conclusion that, contrary to what the trial judge determined, the aiding-and-abetting instruction was not supported by the evidence because the prosecution presented no proof that another person participated in the murder.

tool and Smith's medical records.  The court said these requests indicated that the jury was focused on whether Smith had the strength to beat his wife to death, and not on whether he aided and abetted someone else.

After determining that the trial court's aiding-and-abetting instruction was not, by itself, prejudicial error, the court of appeal also rejected Smith's claim that the prosecution failed to provide him with constitutionally adequate notice of its aiding-and-abetting theory.  First, the court explained, quoting *People v. Diaz*, 834 P.2d 1171, 1203 (Cal. 1992), that "'under [California's] statutory scheme, an accusatory pleading charging a defendant with murder need not specify the theory of murder on which the prosecution intends to rely.'"  Based on this established state rule, the court held that the information provided Smith with adequate notice that he could be liable as an aider and abettor.

Next, the court of appeal acknowledged, quoting *Diaz*, 834 P.2d at 1203, that "'there are situations in which the United States Constitution may require greater specificity'" concerning the basis for the defendant's liability.  It then concluded that the evidence at Smith's preliminary examination provided that additional specificity. Specifically, the court pointed to the preliminary hearing testimony of Detective McShane about the incriminating statements that David Moraga claimed Smith made while they were housed together in the same cell.  The court found that this testimony "suggests defendant may not have personally committed the murder."  The court therefore concluded that "even in the absence of an aider and abettor liability allegation in the information, the evidence presented at defendant's preliminary examination meaningfully

apprised him of the potential for an aiding and abetting theory."

Finally, the court of appeal found that the prosecution did not "ambush" Smith with the aiding-and-abetting theory because "[t]he prosecution's request for aiding and abetting liability instructions occurred during the parties' general discussion of the jury instructions and not just prior to closing argument," and because the prosecution only mentioned the aiding-and-abetting theory in its rebuttal argument. The court affirmed Smith's conviction. The California Supreme Court denied a petition for review without citation or comment.

In his federal habeas petition, Smith again claimed that his constitutional right to adequate notice of the nature of the charges against him was violated when the trial court instructed the jury on aiding-and-abetting liability.[2] The district court agreed and adopted the magistrate judge's recommendation to grant Smith's petition. The state timely appealed.

II

We review de novo the district court's decision to grant a habeas petition, and we review the district court's underlying factual findings for clear error. *Merolillo v. Yates*, 663 F.3d 444, 453 (9th Cir. 2011). We may affirm the district court's decision on any ground supported by the record, even if it differs from the district court's rationale. *Id.*

---

[2] In addition to his notice claim, Smith raised another claim not at issue in this appeal.

Because Smith filed his federal habeas petition after April 24, 1996, we apply 28 U.S.C. § 2254 as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). Under § 2254, a state prisoner may not obtain federal habeas relief for any claim that was adjudicated on the merits by a state court unless the state court's decision was (1) "contrary to" clearly established federal law as determined by the Supreme Court, (2) "involved an unreasonable application of" such clearly established law, or (3) "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d); *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011).

A

The Sixth Amendment and basic principles of due process guarantee a criminal defendant the fundamental right to be informed of the nature and cause of the accusations against him so that he may have a meaningful opportunity to prepare an adequate defense against every issue raised by those accusations. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation . . . ."); *Cole v. Arkansas*, 333 U.S. 196, 201 (1948) ("No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceedings in all courts, state or federal."); *In re Oliver*, 333 U.S. 257, 273 (1948) ("A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense—a right to his day in court—are basic in our

system of jurisprudence . . . ."). Notice must be sufficiently detailed to enable a defendant to address all the relevant issues in his defense. *Russell v. United States*, 369 U.S. 749, 766–68 (1962) (Sixth Amendment violated where an indictment left the "chief issue undefined," thereby allowing "the prosecution free to roam at large" and present the defendant "with a different theory, or . . . no theory at all" at every stage of the criminal proceedings). Therefore, we have repeatedly recognized that a defendant who is charged with first-degree murder is entitled to notice of what specific theory of murder the prosecution intends to pursue. *See, e.g.*, *Murtishaw v. Woodford*, 244 F.3d 926, 953–54 (9th Cir. 2001) (right to notice of the prosecution's felony-murder theory); *Morrison v. Estelle*, 981 F.2d 425, 428 (9th Cir. 1992) (same); *Sheppard v. Rees*, 909 F.2d 1234, 1235 (9th Cir. 1990) (same); *Givens v. Houseright*, 786 F.2d 1378, 1380–81 (9th Cir. 1986) (right to notice of the prosecution's murder-by-torture theory).

The starting point for determining whether a defendant received adequate notice of the charges against him is the charging document. *Gautt v. Lewis*, 489 F.3d 993, 1003 (9th Cir. 2007). The charging document "must in some appreciable way apprise the defendant of the charges against him so that he may prepare a defense accordingly." *Id.* at 1004; *Givens*, 786 F.2d at 1380. When the charging document does not specify the prosecution's theory of a crime, trial and pretrial proceedings may nonetheless provide a defendant with constitutionally adequate notice. For example, a defendant may receive notice of the prosecution's theory from the prosecutor's opening statement, *see* *Murtishaw*, 255 F.3d at 954; *Calderon v. Prunty*, 59 F.3d 1005, 1009 (9th Cir. 1995), or the evidence presented at trial, *see Murtishaw*, 255 F.3d at 954; *Morrison*, 981 F.2d at

428–29.[3] We also may examine the trial record to determine whether the defendant knew that a particular theory was on the table. *See Murtishaw*, 255 F.3d at 954.

In limited circumstances, the actions of the prosecution may lead the defendant to reasonably believe that a particular theory is off the table, notwithstanding any prior notice from the charging document. In *Sheppard v. Rees*, the information charged the defendant with one count of murder under California Penal Code § 187, and the prosecution tried the case on the theory that the defendant personally committed premeditated murder. 909 F.2d at 1235. The concept of felony-murder was never mentioned, directly or indirectly, during the pretrial proceedings, opening statements, or trial. *Id.* Nor was there any mention of felony-murder when the judge settled the jury instructions. *Id.* But the morning after the instructions conference, and just before closing arguments, the prosecution requested an instruction on felony-murder, which the trial court gave over a defense objection. *Id.* at 1235–36. On appeal, we agreed with the state's concession that under the circumstances of that case, the felony-murder instruction violated the defendant's

---

[3] In *Morrison*, we held that a defendant received constitutionally adequate notice of the prosecution's felony-murder theory in part through the jury instructions the prosecutor submitted two days before closing arguments. 981 F.2d at 428–29. However, more recently we found the argument "troublesome" that "jury instructions or closing arguments— sure signs that the *end* of a trial is drawing near—could substitute for sufficient notice to a defendant of the charges that have been leveled against him." *Gautt*, 489 F.3d at 1010 (emphasis in original). A jury instruction "cannot itself serve as the requisite notice of the charged conduct, coming as it does *after* the defendant has settled on a defense strategy and put on his evidence." *Id.* Nevertheless, in *Gautt* we assumed without deciding that jury instructions "can be parsed for evidence of notice to the defendant." *Id.*

fundamental right to notice of the nature of the charges against him because "a pattern of government conduct affirmatively misled the defendant, denying him an effective opportunity to prepare a defense." *Id.* at 1236 (emphasis removed). The principal evil, we explained, was that

> the prosecutor "ambushed" the defense with a new theory of culpability after the evidence was already in, after both sides had rested, and after the jury instructions were settled. This new theory then appeared in the form of unexpected jury instructions permitting the jury to convict on a theory that was neither subject to adversarial testing, nor defined in advance of the proceeding.

*Id.* at 1237.

*Sheppard* was a "narrow ruling," and we have distinguished it where the facts of a case varied even slightly. For example, in *Morrison* we held that the defendant had adequate notice of the prosecution's felony-murder theory from the evidence presented at trial. 981 F.2d at 428. We also held that the defendant was not "ambushed" by the felony-murder theory because defense counsel had a full two days to prepare for closing arguments after the prosecution requested a felony-murder theory. *Id.* Likewise, in *Stephens v. Borg* we found no ambush where defense counsel had five days to prepare for closing arguments after receiving notice of the prosecution's intention to rely on a felony-murder theory. 59 F.3d 932, 936 (9th Cir. 1995).

Nonetheless, *Sheppard* remains instructive. Although it was a pre-AEDPA case, it faithfully applied the principles

enunciated by the Supreme Court in *Cole*, *Oliver*, and *Russell*.

B

The district court correctly concluded that Smith's right to notice of the nature of the charges against him was violated when the trial court gave the prosecution's requested aiding-and-abetting instruction. This case is indistinguishable from *Sheppard*: by requesting the jury instruction just before closing argument and without any prior indication that it was pursuing an aiding-and-abetting theory, the prosecution ambushed Smith and denied him a meaningful opportunity to prepare his defense.

The information charging Smith with first-degree murder was initially sufficient to put him on notice that he could be convicted either as a principal or as an aider-and-abettor. *See Carothers v. Rhay*, 594 F.2d 225, 229 (9th Cir. 1979) (holding that a defendant who was charged with first-degree murder had constitutionally adequate notice that he could be convicted as an aider and abettor; under state law, anyone who participated in the commission of a crime was liable as a principal regardless of his level of participation). In California, aiding and abetting a crime is the same substantive offense as perpetrating the crime, so aiders and abettors may be punished as principals. Cal. Penal Code § 31; *People v. Jenkins*, 997 P.2d 1044, 1130 (Cal. 2000).

However, notwithstanding any notice provided by the information, the prosecution's conduct throughout the pretrial and trial proceedings affirmatively led Smith to reasonably believe that it would not rely on an aiding-and-abetting liability theory. At the very beginning of his opening

statement, the prosecutor told the jury that "the evidence will show that *that man* over there at the end of counsel table [i.e., Smith], wearing the nice sweater, *murdered his wife* of 27 or 28 years, and then *he* staged the crime scene to make it look like a burglary to avoid detection." (emphasis added). Later, the prosecution again told the jury that "the *defendant bludgeoned* [Minnie Smith] to death, *bound her arms* behind her with a wire coat hanger, and then staged the scene to look like a burglary." (emphasis added). Neither statement permits the interpretation that Smith acted with or through another person, so the prosecution made clear that it was pinning Smith as the sole perpetrator of the murder. *Cf. Murtishaw*, 255 F.3d at 954 (finding that the defendant received adequate notice of the prosecution's theory of the murder from the prosecutor's opening statement).

Like its opening statement, the prosecution's case-in-chief precluded the possibility that a third person was involved in Minnie Smith's murder. The prosecution introduced evidence showing that the DNA found on Minnie Smith's body, the murder weapon, and other objects at the murder scene matched the DNA of only three people: Marvin Smith, Minnie Smith, and a crime lab technician who visited the murder scene. From these actions, Smith reasonably could have drawn the inference that the prosecution was not trying him as an aider and abettor. Indeed, the prosecution's initial closing argument confirmed that inference: it emphasized how easy it is for a person's DNA—such as the DNA of the crime lab technician—to end up on objects in their presence, and then argued that the absence of another individual's DNA at the murder scene meant that *no unidentified perpetrator* could have killed Minnie Smith.

Conversely, and as the California Court of Appeal recognized, the prosecution presented *no evidence* at trial to support an aiding-and-abetting theory. Therefore, unlike those cases where we have found constitutionally adequate notice from the presentation of evidence, there was nothing at trial that might have indicated to Smith that aiding-and-abetting liability was on the table. *Cf. Carothers*, 594 F.2d at 229 (holding that there was notice of an aiding-and-abetting theory where the defendant was charged with first-degree murder and the evidence showed that another person accompanied the defendant to the scene of the crime).

Smith's conduct at trial further supports the conclusion that he had no meaningful notice of the prosecution's intent to pursue an aiding-and-abetting theory. *See Murtishaw*, 255 F.3d at 954 (explaining that we may examine the defendant's conduct for evidence of constitutionally adequate notice). Defense counsel presented an alibi and argued that Smith was physically incapable of bludgeoning his wife to death. These defenses would have been meaningless against an accusation that he somehow assisted or worked through another person to kill Minnie Smith. Furthermore, unlike the defendant in *Murtishaw*, Smith never questioned any witnesses with respect to the possibility that he participated in the murder with another person. *See id.*

Unlike the defendants in *Morrison* and *Stephens*, who had several days after the jury instructions conference to prepare an argument to counteract the prosecution's unexpected theory, closing arguments in this case commenced almost immediately after the trial judge agreed to give the unexpected instruction. *Cf. Stephens*, 59 F.3d at 936; *Morrison*, 981 F.2d at 428. In fact, defense counsel had only the lunch recess to formulate a response to the prosecution's

new theory, and the prosecutor waited until his rebuttal to raise the aiding-and-abetting theory, depriving defense counsel of any opportunity to actually respond. As in *Sheppard*, the prosecution here requested the new instruction the same day as closing arguments. *See* 909 F.2d at 1235–36. Moreover, unlike *Morrison*, there was no evidence presented at Smith's trial to give him any inkling that the prosecution would ask for an aiding-and-abetting instruction. *Cf.* 981 F.2d at 428. Therefore, Smith's constitutional right to notice, under *Cole*, *Oliver*, and *Russell*, was violated.

The state argues that Smith should have been aware that aiding-and-abetting liability was on the table because his defense theory necessarily implied that another person murdered his wife. Contrary to the state's logic, implying that someone else killed the victim does not necessarily invoke a new question as to aiding and abetting. Indeed, the defense theory was that Matthews had an independent motive to burglarize the house, and he knew facts about the murder scene unknown to others. However, pointing his finger at Matthews did not automatically implicate Smith as Matthews's accomplice, and it certainly did not show that he knew the *prosecution* was pursuing an aiding-and-abetting theory. Similarly, Matthews's statements on cross-examination that Smith would have acted with a man named Nelson Nealy to kill Minnie did not raise the possibility of aiding-and-abetting liability. Matthews's comments were totally uncorroborated and speculative, and were in answer to a larger line of questions by which defense counsel tried to suggest that Matthews may have been the murderer.

The state also echoes the California Court of Appeal's conclusion that the preliminary hearing testimony of Detective McShane "meaningfully apprised" Smith of the

potential for an aiding-and-abetting theory.'"**4**  It is puzzling, however, how anyone could divine even a remote possibility of an aiding-and-abetting theory from the preliminary hearing transcript.  Moraga's statements to Detective McShane suggested only that Smith had a motive to kill his wife and that he took several steps to make the house appear as if it had been burglarized.  His statements did not indicate that Smith took these steps so that some other, unmentioned person could enter the house and commit the murder.  Nor did defense counsel's cross-examination of Detective McShane raise the possibility that the prosecution would pursue an aiding-and-abetting theory.  When defense counsel asked the detective whether Moraga knew any details about the murder—including the manner of the killing, who specifically did the killing, and when the killing occurred—she was seeking to impeach Moraga's credibility by showing that Moraga, after spending six months in a cell with Smith, knew very little about the crime that he claimed Smith confessed to committing.  By impeaching Moraga, the defense did not acknowledge that the prosecution was pursuing an aiding-and-abetting theory.  Indeed, it does not even appear that the defense's cross-examination gave the *prosecution* that idea—the prosecution's trial brief and motions in limine, filed nearly three months after the preliminary hearing, argued that Moraga's testimony served only to identify *Smith* as the perpetrator.

In sum, the prosecution tried its case on one theory—that Smith directly perpetrated his wife's murder.  The prosecution presented no evidence in support of aiding-and-

---

**4** The district court clearly erred in stating that Smith accepted this conclusion.  Smith challenged it in his federal habeas petition, and he continues to challenge it on appeal.

abetting liability, and its opening statements and case-in-chief seemed to firmly preclude the possibility that an unidentified person killed Minnie Smith. Until the jury instructions conference, no one had ever mentioned the possibility of an aiding-and-abetting theory. Therefore, when the trial court instructed the jury on aiding-and-abetting liability, Smith was "ambushed" and his fundamental right to notice of the nature of the accusations against him was denied in violation of *Cole*, *Oliver*, and *Russell*.

## C

The district court correctly determined that the trial court's error in instructing the jury in aiding-and-abetting liability was not harmless. We must grant relief if the constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). Reversal is required where "the record is so evenly balanced that a 'conscientious judge is in grave doubt as to the harmlessness of an error.'" *Gautt*, 489 F.3d at 1016 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 438 (1995)).[5]

---

[5] The Supreme Court has not stated definitively whether a violation of the Sixth Amendment right to notice is subject to harmless error analysis. *Gautt*, 489 F.3d at 1015. In *Sheppard*, we decided that violation of the Sixth Amendment right to notice was structural error requiring automatic reversal. 909 F.2d at 1238. However, in *Gautt* we questioned that part of *Sheppard* because it predated several Supreme Court decisions stressing the limited category of structural errors. *Gautt*, 489 F.3d at 1015. However, we declined to reach that issue in *Gautt*, because we found that the error in that case was not harmless. *Id.* at 1016. We do the same here because we conclude that the trial court's error was not harmless.

Here, the trial judge acknowledged that Smith presented a strong defense and that the evidence on both sides was closely balanced.  The California Court of Appeal expressed a similar assessment in its first decision, which described Smith as presenting "an arguably successful defense concerning his identity as the perpetrator of a crime."  Given this evenly balanced record, and the fact that the prosecutor invited the jury to speculate—at the last minute and without any evidence—about Smith's liability as an aider and abettor, the district court was correct to have grave doubts about the validity of the jury's verdict.

D

For the purpose of determining whether § 2254(d) bars habeas relief, we review the last reasoned state-court decision.  *Gill v. Ayers*, 342 F.3d 911, 917 n.5 (9th Cir. 2003).  Here, because the California Supreme Court denied Smith's petition for review without citation or comment, we "look through" the California Supreme Court's decision to the California Court of Appeal's second decision, in which it affirmed Smith's conviction on remand from the California Supreme Court.  *Id.*  Section 2254(d) does not bar habeas relief where the state court's decision was "based on an unreasonable determination of the facts" in light of the record before the state court.  28 U.S.C. § 2254(d)(2).

A state court's determination of facts is unreasonable "where the state court[] plainly misapprehend[s] or misstate[s] the record in making [its] findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim."  *Id.* at 1001.  Here, the California Court of Appeal determined that Detective McShane's preliminary hearing testimony about statements

Smith purportedly made to Moraga "meaningfully apprised [Smith] of the potential for an aiding and abetting theory." But, as we have noted above, the purported statements simply do not support such a theory. The California Court of Appeal also determined that "[t]he prosecution's request for aiding and abetting liability instructions occurred during the parties' general discussion of the jury instructions and *not just prior* to closing argument." (emphasis added). This is also a misstatement of the record. Just as in *Sheppard*, the prosecution requested, and the trial judge decided to issue, the aiding-and-abetting instruction on the morning of the day of closing arguments. *See* 909 F.2d at 1235. Defense counsel had only the lunch recess to formulate a response to the new theory.

At oral argument, the state suggested that the trial court's error in giving the aiding-and-abetting instruction should be analyzed solely under *People v. Guiton* and *Griffin v. United States*. 847 P.2d at 51. Under those cases, reversal of a conviction is not required solely because a jury is instructed on a factually unsupported theory. *Griffin*, 502 U.S. at 60; *Guiton*, 847 P.2d at 52. Rather, "the appellate court should affirm the judgment unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory." *Guiton*, 847 P.2d at 53; *see Griffin*, 502 U.S. at 59. Here, the California Court of Appeal concluded that under *Guiton*, the trial court's error did not require reversal of Smith's conviction because there was no affirmative indication in the record that the jury based its guilty verdict *solely* on the factually unsupported aiding-and-abetting theory. The state suggests that because the California Court of Appeal's decision with respect to the *Guiton* question was neither "contrary to" nor "an

unreasonable application of" *Griffin*, § 2254(d)(1) precludes federal habeas relief on Smith's Sixth Amendment notice claim.

This argument conflates two fundamentally different inquiries. Whether the trial court's factually unsupported aiding-and-abetting instruction required reversal by itself is a separate question from whether Smith had adequate notice of—and a meaningful opportunity to defend against—the prosecution's aiding-and-abetting theory.[6] *Griffin* and *Guiton* concern only the former, while the Sixth Amendment, *Cole*, and *Sheppard* concern the latter.

In *Griffin*, there was never any doubt about what crime the defendant was charged with and what theories the prosecution was trying to prove: the defendant was charged with one count of conspiracy with two objects—(1) defrauding the Internal Revenue Service, and (2) defrauding the Drug Enforcement Agency ("DEA")—and the prosecution always sought to prove both. 502 U.S. at 47. But because certain testimony anticipated by the prosecution failed to materialize, there was insufficient evidence to connect the defendant to the DEA object. *Id.* at 48. Likewise, in *Guiton* the defendant was charged with one count of selling *or* transporting cocaine, and the prosecution sought to prove that the defendant transported cocaine *and* that he sold it. 847 P.2d at 46–47. The problem was that the prosecution failed to present sufficient evidence in support of its theory that the defendant sold cocaine, and the reviewing court could not definitively determine from the general verdict whether the jury convicted based on the valid theory of transportation or the invalid theory of sale. *Id.* at 47.

---

[6] The California Court of Appeal also treated these as separate issues.

Because in both *Griffin* and *Guiton*, it was clear from the beginning what theories the prosecution sought to prove, the defendant's Sixth Amendment right to notice of the nature of the accusations was not implicated. *Griffin*, 502 U.S. at 47; *Guiton*, 847 P.2d at 46–47; *see also Griffin*, 502 U.S. at 48 (explaining that it was unnecessary to discuss the Sixth Amendment). The only question in those cases was whether courts should automatically reverse based on the assumption that, absent a contrary indication in the record, the jury based its verdict on a factually unsupported theory of the crime. In contrast, in cases interpreting the Sixth Amendment's guarantee of notice, the problem was that the prosecution did *not* articulate the specific charges, enhancements, or theories which it sought to prove. *See, e.g.*, *Russell*, 369 U.S. at 766–68; *Gautt*, 489 F.3d at 998–99; *Sheppard*, 909 F.2d at 1235; *Givens*, 786 F.2d at 1380. The Sixth Amendment notice problem is separate and unrelated to the question of whether a factually unsupported jury instruction, by itself, requires reversal.

For similar reasons, as we have already noted, the California Court of Appeal's determination that Smith was not prejudiced under the *Guiton* standard does not preclude us from holding that Smith was prejudiced by the trial court's violation of his fundamental right to notice of the accusations against him. *Guiton*'s prejudice standard is different from the *Brecht* harmless error standard, which applies to the violation alleged here. Under *Guiton*, courts must affirm a conviction unless the record affirmatively indicates that the jury based its verdict *solely* on the unsupported theory of liability. *Guiton*, 847 P.2d at 53. By contrast, under *Brecht* federal courts must reverse a conviction if a constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623. The *Brecht* standard is

different, and less demanding, than the *Guiton* standard. *Cf. Mancuso v. Olivarez*, 292 F.3d 939, 950 (9th Cir. 2002) ("'The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.'" (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946))). Accordingly, we are not constrained by § 2254(d)(1) in deciding that the trial court's error in this case was not harmless. *See Williams v. Taylor*, 529 U.S. 362, 406 (2000).

## CONCLUSION

The prosecution's conduct affirmatively led Smith to believe it would not rely on an aiding-and-abetting liability theory. Thus, the aiding-and-abetting jury instruction violated Smith's fundamental right to receive notice of the nature of the charges against him and have a meaningful opportunity to prepare a defense. Given the closely balanced evidence, we cannot say that the trial court's error was harmless. Therefore, we affirm the judgment of the district court granting a conditional writ of habeas corpus.

**AFFIRMED.**